UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Claire C. Cecchi |
| | : | |
| v. | : | Criminal No. 24-CR-623 |
| | : | |
| TD SECURITIES (USA) LLC | : | <u>Violation</u>: |
| | : | 18 U.S.C. § 1343 (Wire Fraud) |
| | : | |

# I N F O R M A T I O N

The United States of America charges:

## COUNT ONE

(Wire Fraud)

At all times relevant to this Information:

<u>Relevant Individuals and Entities</u>

1. TD Securities (USA) LLC ("TD") was a financial institution with its principle offices located in New York, New York, where the TD desk that traded U.S. Treasuries ("U.S.T. Desk") was located.

2. Jeyakumar Nadarajah was employed as a Director at TD. In that capacity, Nadarajah was the Head of TD's U.S.T. Desk and traded U.S. Treasuries both on behalf of clients of TD and on behalf of TD.

3. Broker-1 provided, among other things, markets for trading U.S. Treasuries.

1

Market Background and Definitions

4. To raise capital to operate the federal government and finance the national debt, the U.S. Department of the Treasury ("Treasury") issued and sold marketable securities in the form of bills, notes, bonds, and certain related instruments at public auction (collectively, "U.S. Treasuries"). U.S. Treasuries were subject to fixed terms at fixed interest rates determined by the prevailing rates in the marketplace at the time of issuance. U.S. Treasuries were issued in different denominations, including the five-year U.S. Treasury note, ten-year U.S. Treasury note, and 30-year U.S. Treasury bond (collectively, "U.S. Treasuries Products"). After the Treasury auctioned U.S. Treasuries Products, institutional and individual investors could buy and sell these securities in the secondary (or "cash") market.

5. U.S. Treasuries Products were securities in all respects relevant to this Information.

6. Broker-1 provided, among other financial services, an electronic marketplace for trading U.S. Treasuries Products in the cash market. Broker-1's servers for trading U.S. Treasury Products were located in and around Secaucus, New Jersey.

7. Individuals who sought to trade U.S. Treasuries Products on Broker-1 did so through a "Trader Identification" or user-id through which orders for U.S. Treasuries Products were placed, cancelled, and executed. Broker-1 anonymized the identity of the market participants trading U.S. Treasuries Products such that any market participant could not view the user-id associated with another trader.

8. Nadarajah traded U.S. Treasuries Products on Broker-1 with the Trader Identification "BUTDUJNA2I."

9. As Head of the U.S.T. Desk at TD, Nadarajah was a manual trader and decided himself whether and how to place his orders for U.S. Treasuries Products on Broker-1, as opposed to operating an automated or algorithmic trading strategy.

10. Broker-1 permitted, among other things, traders in the cash market for U.S. Treasuries Products to place orders to buy ("bid") or sell ("offer") a U.S. Treasury Product at a specific price and amount ("lots"). Broker-1 displayed such orders in a visible "order book" that aggregated the bids and offers at specific prices until such orders were either cancelled or executed. An order was "filled" or "executed" when a buyer's bid price and a seller's offer price matched for a U.S. Treasuries Product.

11. An "iceberg" order was a type of order that traders on Broker-1could place either to buy or to sell U.S. Treasuries Products. With an iceberg order, a trader chose to display to other market participants in the order book only a pre-set number of lots in the overall order. If a trader filled the displayed quantity of lots, another order for the same number of lots and at the same price automatically replaced it in the order book. That process repeated itself until a trader either filled the overall number of lots in the order or cancelled it.

12. By contrast, a "fully displayed" order on Broker-1 displayed at once in the order book all the lots or contracts in an order. Those lots could be filled by other counterparties until cancelled.

13. "Spoofing" was the act or practice of bidding or offering with the intent, at the time the bid or offer was placed, to cancel the bid or offer before it was executed to give the false appearance of genuine supply or demand to other market participants.

14. "Layering" was the act or practice of placing two or more spoof orders, often at different times and at different prices in the order book, to give the false appearance of genuine supply or demand to other market participants.

15. Both Broker-1 and TD prohibited spoofing and layering in U.S. Treasuries Products.

## Spoofing and Layering Scheme

16. Nadarajah knew that spoofing constituted market manipulation, could give a false impression of supply and demand to other market participants trading U.S. Treasuries Products, and was a prohibited practice at TD.

17. Nadarajah also knew that layering was also a form of market manipulation that involved efforts to move prices in a certain direction.

18. Nonetheless, Nadarajah engaged in and executed a spoofing and layering scheme in the cash market for U.S. Treasuries Products at TD.

19. To carry out the scheme, Nadarajah placed the following orders in U.S. Treasuries Products:

   a. Nadarajah placed one or more orders for a U.S. Treasury Product that he intended to execute ("Genuine Orders"). Nadarajah placed one or more Genuine Orders usually as iceberg orders, so that only a

       portion of the Genuine Order's full quantity was displayed at any given time in the order book.

    b. In the same trading sequence, Nadarajah engaged in the act of spoofing and layering by placing opposite the Genuine Orders one or more orders that he did not intend to execute at the time the order was placed ("Spoof Orders"). For example, if Nadarajah placed a Genuine Order to buy, he placed one or more Spoof Orders to sell. Nadarajah generally placed one or more Spoof Orders as fully displayed orders, so that the full quantity of each Spoof Order was displayed at once in the order book.

    c. After filling his Genuine Orders in whole or in part, Nadarajah quickly cancelled the Spoof Order(s) to attempt to avoid filling those orders, as he intended at the time of placing those orders.

20. Nadarajah placed one or more Spoof Orders on both the bid and offer side in the cash market for U.S. Treasuries Products, depending on the placement on his Genuine Orders.

21. By placing one or more Spoof Orders to buy U.S. Treasuries Products, Nadarajah intended to inject false and misleading information about genuine demand into the market and to manipulate and artificially increase the market prices of those products. In this way, Nadarajah intended that one or more Spoof Orders to buy would fraudulently induce other market participants to fill his Genuine Orders to sell at artificial and manipulated prices.

22. By placing one or more Spoof Orders to sell U.S. Treasuries products, Nadarajah intended to inject false and misleading information about genuine supply into the market and to manipulate and artificially decrease the market prices of those products. In this way, Nadarajah intended that one or more Spoof Orders to sell would fraudulently induce other market participants to fill his Genuine Orders to buy at artificial and manipulated prices.

23. In executing the scheme to defraud in connection with the purchase and sale of U.S. Treasuries Products and the placement of Spoof Orders, Nadarajah was acting within the scope of his employment as an employee of TD and its affiliates, and as an agent of TD, and with the intent, at least in part, to benefit TD.

24. Nadarajah caused Spoof Orders in U.S. Treasuries Products to be transmitted electronically via interstate wire communications from TD's U.S.T. Desk located in and around New York, New York to Broker-1's servers located in and around Secaucus, New Jersey.

25. For purposes of executing the scheme to defraud, on or about May 8, 2019, at approximately 8:43:21.315351 a.m. ET, Nadarajah placed an iceberg Genuine Order to buy approximately 400 10-Year U.S. Treasury notes ("UST") at approximately $101.671875. Then, approximately 1.956089 seconds later, at 8:43:23.271440 a.m. ET, Nadarajah placed a Spoof Order to sell approximately 800 UST at approximately $101.687500, part of a group of approximately three Spoof Orders to sell a total of approximately 2,200 UST, with the intent to create the illusion of supply, deceive other market participants, induce other market

6

participants to execute with the Genuine Order, and artificially move the market price lower. Next, approximately 46 microseconds after the first Spoof Order was placed, beginning at approximately 8:43:23.271486 a.m. ET, approximately 176 UST in the Genuine Order were filled. Lastly, approximately 2.497359 seconds after the last UST was filled, Nadarajah started canceling the group of Spoof Orders. After approximately 7.832 milliseconds, the Spoof Orders were canceled in their entirety.

      All in violation of Title 18, United States Code, Section 1343.

_____
NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General
Criminal Division
United States Department of Justice


GLENN S. LEON
Chief
Criminal Division, Fraud Section


_____
John J. Liolos, Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section

CASE NUMBER: 24-CR-623 (CCC)

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**TD SECURITIES (USA) LLC**

# INFORMATION FOR

**18 U.S.C. § 1343**

NICOLE M. ARGENTIERI
PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

JOHN J. LIOLOS
TRIAL ATTORNEY
FRAUD SECTION
202-514-2000